to find out what we think before we announce our decision. All right, so let's go ahead and put please call the first case. In re TBH19, LLC, David Shimano appearing for Appellants. Carolyn Dye appearing for Appalese, Sam Leslie, Chapter 7, trustee and Leah accountancy, LLP and Ryan O'Day appearing for Appalese, Schulman, Bastion, Friedman and Bui, LLP. All right, before we turn to Mr Shimano, let me ask Ms. Dye and Mr. O'Day. Have you agreed on how to divide up your 15 minutes? Yes, your honor. We have Ms. Dye is going to take the first 10 minutes and I will take the second five minutes, your honor. Okay, very good. Mr. Shimano, you got to reserve some time for rebuttal. I will aspirationally reserve three minutes, your honor. Three minutes. All right, very good. Go ahead, please. Well, good afternoon. We may please the court, David Shimano on behalf of the Har Unsecured Creditors. This appeal is the culmination of a fundamental disagreement with the trustee concerning the appropriate administration of a Chapter 7 case in which the sole asset is a very valuable asset in which is fully encumbered. The trustee through its conduct throughout the case and in his argument to the bankruptcy court and in several appeals has taken the position that it's perfectly appropriate in such cases for the trustee to negotiate a carve-out and then administer the case for the primary benefit of the trustee and his professionals. And by primary benefit, the trustee and his professionals requested and the court approved fees representing 96% of the 3.75 million carve-out. Let me stop you for just a second. Your client, the one who was the second lien holder, agreed to the carve-out, correct? We did not. Yes, we consented to the trustee administering the case in exchange for the carve-out. That is correct. You stipulated to it, or that client stipulated to that, I should say. That's correct. Okay, go ahead. And the trustee kind of defends this conceptually by saying in cases like this, the unsecured creditors are out of the money. They really don't have a pecuniary interest in the case. They're kind of like the debtor in the typical Chapter 7 case who really doesn't even have standing to appear on most issues. And therefore, if the unsecured creditors really have no cause to complain, if the trustee kind of utilizes this case to kind of make up for all the no-asset cases that he otherwise has to do, this is his big opportunity. The compensation scheme under the code is what it is. And this is just the game that we all understand has to be  played. We have an unwritten rule deal with the U.S. trustee. Really grounded by the obligation, you know, ultimately, I mean, you're challenging several fee applications. The trustees, which is a straight commission, that's an extraordinary circumstances. And then the professionals for reasonable compensation are 330, right? Correct. All of that was baked in at the time of the agreement of the carve-out though, wasn't it? When you say baked in, what I interpret that to mean was when the trustee negotiated the carve-out, which happened immediately upon the commencement of the appointment of the trustee, was that, okay, we have a property which we know is going to sell within a range. If that property is sold at that range, what would it generate as a fee? As a commission. You should have been able to know exactly at the time of the amount of the debt. So you knew that it had, that was going to be some boundary as to what the asset would generate and statutorily, trustees commit, is entitled to commission on secured payments, correct? That's correct. So you, I mean, it sounds like there's a lot of surprise here, but it had to be known that any sale of that property was going to generate a significant commission by virtue of the asset and the debt that was there. Your Honor, I think you're begging the question. And the question is, in a case like this, where, yes, presumptively, I mean, this court has held in this situation, the trustee is presumptively supposed to abandon the property. If it elects to proceed and negotiate a carve-out, that doesn't change its duty to administer the case primarily for the benefit of unsecured creditors. So the question is, what is the, what is reasonable compensation in a case where at its commencement, there was, the state was never going to realize $63 million available for unsecured creditors. It was going to realize the carve-out. And so this is the policy decision that has to be determined by this panel, which was entirely- But you agreed to the carve-out as Judge Ferris pointed out. You agreed. So really, it's the divvying it up and the dependence upon the administrative costs to get to that point, correct? Absolutely. Yeah, we're not disagreeing about there should have been a carve-out. The issue is, based upon this panel's prior decisions, discussing extraordinary circumstance and discussing meaningful distribution, what is a reasonable compensation for a trustee in a case where at the commencement of the Chapter 7 case, we knew that the proceeds we distributed were going to be the carve-out amount, not the proceeds of the sale itself. And so, you have to decide this. This is a policy decision and we suggest- You know, I got to say, I don't think it's a policy decision. I think it's a statutory decision. And as I understand it, your basic argument is that the trustee and professional shouldn't get more than half of the carve-out. I think that's fundamentally what you're saying. How do you support that in the statute? Well, I think the way the statute works is that the compensation always must be reasonable. That is an absolute standard. Even for the trustee? Absolutely, with the trustee. What is clear from 330 is, the trustee is not to be measured by a lodestar. We absolutely agree with that. He's entitled to a commission. The question is, what is the reasonable commission in a case? This court held in- But doesn't the statute tell us what the commission is? I mean, the percentages are laid out in the statute. That's the maximum commission. That's the maximum commission. It is not an absolute. And what this court said- Why wasn't that negotiated at the carve-out? We weren't party to the negotiation, your honor. That's part of the problem. You were a party to the case with the effectively unsecured debt, whose only hope was getting something from this asset. And there was a motion to approve it, to which you stipulated. You stipulated to the carve-out. And then as Judge Fares is saying, there's a statutory rubric for the distribution of payments within the seven that goes administrative first. And that administrative was known within a range or projected within a range by virtue of the asset being sold based upon the commission. I disagree with you, your honor, is I read KVN to say that when the court considers the propriety of the carve-out, the trustees fee from that carve-out is not an issue when the court approves the carve-out. The trustees fee is to be determined from the carve-out at the conclusion of the case. That's how I read KVN. Now, if you want to say that there's a burden on creditors to oppose a carve-out unless the carve-out spells out and all these issues have to get thrashed out at the hearing to approve the carve-out, then you'll write a decision that says that. But that's not what KVN says and that's not what the case law following KVN says. It says you look at the extraordinary circumstances is measured at the end of the case rather than at the carve-out which allowed the administration of the over-secured asset. We cite you the cases that have dealt with this and not a lot of them, but each of those cases say you don't thrash out the compensation issue when you're considering the carve-out. You consider that. But doesn't KVN say you shouldn't approve, the court shouldn't approve the carve-out unless there's going to be a, I forget what the exact term is, a distribution of unsecured creditors and doesn't the trustees compensation play a role in that? I mean, I don't see how you can separate the two things, calculating the probability of a material distribution of unsecured creditors from what the trustees compensation is going to be under the statutory percentage. They're related, but again, we're begging the question. The question is, you're presenting with a carve-out, the court is presenting with a request to approve a carve-out. Let me administer the case. And the one issue that the court has to determine is, okay, if I'm going to let you do that, is there a prospect for a meaningful distribution? That's it. That's the only real issue. Whether, where the allocation is with the unsecured creditors and the Chapter 7 professionals, you can't know that what's reasonable until the end of the case. That's absolutely a hindsight analysis. And doesn't KVN say there has to be a possibility of a meaningful distribution to unsecured creditors? To approve the carve-out. Right, right. And you know, I think what the point Mr. Jedspreker is making is, you go into this case, you know what the amount of the carve-out is, you do the math, you figure out what the dollars are, you know the percentage for the Trustees Commission, you do the math, and somebody can say, look, if only the trustee gets paid out of this carve-out, there's only going to be X dollars left for unsecured creditors. You can do that math up front, right? I disagree in this sense. Yes, there is this statutory fee hanging out in the carve-out. There's a statutory fee hanging out in the background. That's absolutely true. But again, you don't know what the ultimate result in the case is until the final fee hearing, until the final report. You really can't do this. You can't. I don't think it's fair to put a burden on a creditor to come in and say, Your Honor, we have to argue about this now. We have to debate what the Trustees Commission should be today. Don't let them sell this property unless we determine they should not get, you know, a full commission, they should only get a partial commission. No, I'm not saying that. I think the argument would be you shouldn't, Your Honor, approve a carve-out at three and a quarter percent, whatever it was. Instead, it needs to be six percent, hypothetically speaking, to produce a meaningful distribution for unsecured creditors. And here's why. You can come out, you can do the math. Why is that such a difficult burden to impose on creditors? Others who stipulate the three and a quarter percent. We believe the burden should be on the trustee. If the trustee wants this fixed and not reviewable at a final fee hearing, when you review final fees, when you determine compensation under 330 at the final fee hearing, if you want that baked in under like a 328A analysis, the trustee's got to propose that in connection with the carve-out motion. That's okay. We're okay with that. We say that in the brief. If you want to treat this as a 328A issue, you should do that. But that's not what the trustee did in this case. And I don't guess what's done in normal cases. I think you basically, the trustee said, I'm willing to take a chance. I want to administer the case. I think I can generate something. Okay. We're not opposing that. We're not opposing that. When we get to the conclusion of the case, let's see what the result was. Let's see the circumstances. Let's look, are there extraordinary circumstances? Is there a meaningful distribution? Let's determine that. And that's what we believe is the correct result. I do want to reserve time. What I want to emphasize to you is that this, you're never going to get a better fact pattern to thrash out these issues. A law professor could not create a hypothetical that gives you better issues and a factual record to really thrash out what you were talking about in KVN. And what you were talking about in Selgado. And the final comment I want to make is, before I get to rebuttal, is several members of this panel were involved with the Earls Custom Wines case. And in that case, they put poor Mr. Smith through the wringer to get a couple thousand dollars. And for attorney's fees. For attorney's fees. Not for trustees. For attorney's fees, I agree. But comparing that to this case where the bankruptcy court basically rubber stamped $3.6 million of fees without a record of the trustee doing anything in this case. We are living in two separate bankruptcy universes. And I just don't think this is the appropriate way you administer, you review compensation in a case, an extraordinary case like this. And so we asked the court, give content to what it said. And reverse. And I will then reserve the remainder of my time. Thank you. Ms. Dye, go ahead, please. Thank you. Good afternoon and may it please the court. My name is Carolyn Dye and as Mr. Shimano has, and I do recognize the arguments that he's made, which I'll address in a moment. I'm going to propose that I take the first few minutes of 10 minutes or so of the time this today and Mr. O'Day will address the Shulman's fees in the final five. So I will be talking about the fees for the trustee and for LEA accountancy, which is the accounting firm that provided the accounting and forensic tax services to the trustee and in which Mr. Leslie is a principal. So, you know, I think to begin, parsing through Mr. Shimano's arguments, this appeal is really not about how this trustee administered this case or any law-based theory about how the trustee fee, in quotes, ought to be  It's simply about more. That's all it's about. And in light of the history of this case, the complications of COVID, the many problems of the property itself, and not to mention the price point of this property, which limited the number of buyers, on that basis alone, the result achieved by the trustee was truly remarkable, except for one thing. In Mr. Shimano's and his clients' analysis, it didn't leave them enough money after the approved fees were paid. But as this court has recognized in his comments, the carve-out was fully disclosed. It was approved without objection by Mr. Shimano's clients. It wasn't known at the time what the percentage or amount would be. I'm sorry, it wasn't on what the percentage would be, but not the amount, because no one even knew if a sale of this property could be achieved. So there was no way to guarantee Mr. Shimano's clients or anyone else what result there would be at the end of the day in this case, and the trustee's administration resulted in an increase of an offer, the first offer of $47 million to $63.1 million. The sale was approved at that price and closed without objection. So Mr. Shimano's objections to the fees were first raised at the interim fee hearing and were overruled. He had time between that hearing and the TFI and final report to figure out what evidence there was to object to these fees, and he didn't bring forth any evidence. So there's nothing in the record, evidence-wise, that supports this analysis that he's trying to ask this court to buy into. There's nothing in the record that suggests this was an error that would require reversal. So parsing through the arguments, this appeal is nothing more than a wish list. They want you to revisit the carve-out, reallocate the money provided from that carve-out, and somehow under some formula, not defined, but perhaps 50%, give the appellants an additional amount of money from the carve-out. Now, in the Chapter 7 trustee case, you look at the numbers, bankruptcy ultimately is all about the numbers, and that's what we're here for today. I think $500,000 that Mr. Shimano's clients received when they weren't going to get anything if the property was foreclosed, that's a number. So another number is the $700,000 that was set aside, represents a distribution of 18.67% of the carve-out. Now, in a normal Chapter 7 case, a distribution of 18 plus percent to unsecured creditors is a pretty good result. That's not bad. The fees were reduced across the board by Mr. Leslie, LEA accountancy, and the showman firm by 20-point something percent to generate the carve-out. That's not insignificant either. So, I think this is, this appeal is cloaked in the mantle of requiring a, quote, meaningful distribution to unsecured creditors, whatever that means in any particular case, is just a request for a redo of how the case was administered. And there's simply nothing in the record that would support that. There's nothing in the case law that I believe supports that. And, you know, looking at the administration of the case, this was not a rubber stamp of the fees. The judge, Justice Orloff, made detailed findings in its tentative rulings that identified the rationale for the decision approving the fees. He made the point that the carve-out itself was the law of the city to adjust it or amend it in any way. There was no basis for finding that the fee calculation itself is per se unreasonable because it's simply, as you pointed out, a function of the calculation under the statute. And there's no cap under the statute. So, there's that. Is it your position that, given the Statutory Commission, really, the tug of this is that it seems like hogs and pigs, right? That this is a lot of money going to the trustee in this case, for one, where the trustees handed, you know, a highly valuable property, which may have been difficult to sell, but was going to sell for a lot of money. So, I think Mr. Shimano's ultimate argument is that this is just too much in this situation where it's just handed over to the trustee to sell and it's sold. It's just too much. Is there ever a situation where that is looked at, you know, other than just by mathematical computation under the commission? Well, the case law sets out the various steps where that has to be done. First of all, we have cases that say the statutory fee is presumptively reasonable. And then we have cases that say, well, maybe not under certain circumstances. So, where is it not presumptively unreasonable? Well, you have to look to find what are called extraordinary circumstances. And the cases reviewing that say, maybe the trustee didn't do his job right, or there's some problem with how the case was administered, or in certain circumstances, there's no real reason to administer the case except for the fact that you're going to get a trustee fee. That's the point here. I think he's trying to make is, again, spinning it back to when you sought the carve-out, you knew based upon the just the bottom line number that was going to be sold for or going to be offered for, the commission was going to be roughly, you know, 1.7 to 2 million dollars, plus there was going to be some attorney's fees, which was likely to be, you know, a fair amount. So out of a, what, 3-7, 3-7-5, you're starting at 2-5 at beginning, aren't you? I think in the trustee's experience of this case, Your Honor, he was starting out at zero. This was a contentious Chapter 11. It had been pending for many months. Judge Gisello was clearly frustrated with the fact that there had been so much litigation, which continued, by the way, after Mr. Leslie was appointed. And there was, this property had been marketed for over a number of months, years, at prices that started at 110 million dollars. When Mr. Leslie got into this, there was absolutely no assurance, even though one would like to say in retrospect, oh, this property is going to sell. There was no assurance that that was, in fact, going to be the case. And there was going to have to be a lot of work to get from point A to that ultimate result. So, yes, there's, it's a large fee in the context of the normal routine Chapter 7, but there's, if Congress had wanted to cap the fees to trustees based upon the results obtained in a case, they could have done that. They didn't do it. It's a statutory fee based upon distributions of creditors. So we go from there to what happened. We go from there to the fact that there is simply no evidence in the record that would support this court to find that Judge Gisolo made errors of fact or law. You'd have to have a firm conviction that that was the case, which I submit can't possibly be done. And I'm running a little bit out of time. I want to give Mr. O'Day some time. So I'm just going to say as to the LEA fees, that the relationship, you know, was disclosed between Mr. Leslie and his accountancy firm. That was approved over no objection. The court found the fees were reasonable under the circumstances. There were no specific objections raised by anyone to the particular time entries and the fees were in fact discounted before they were submitted to remove any possible overlap of services. I want to give Mr. O'Day his time. So unless the court has other questions for me, I will take a break. We're okay. Go ahead, Mr. O'Day. Thank you, Your Honor. May it please the court. Ryan O'Day of Shulman Bastion, Friedman & Bowie. In preparing for today's oral argument, it struck me that this reminded me of sort of a thought of my childhood and that is a game of musical chairs. Unfortunately, the trustee was airdropped into the center of an ongoing game of musical chairs. Screaming, loud music, chairs, people running around, and the trustee and his professionals had the Herculean task of figuring out who's on first and what can be done to help the people dancing around these chairs. Now, the music being played was being sung by all the secured creditors telling the trustee and his professionals that this property is worth a lot of money, $110,000,000, $90,000,000. And so the music kept playing and it became apparent to the trustee and his professionals that the chairs just kept disappearing and there's going to be a lot of people standing around without a place to sit. So today, you are presented with argument from my colleague that the chair is the wrong color. It's the wrong shape, maybe not quite big enough. But guess what? He's sitting in a chair, a chair that would not be there, but for the efforts of the trustee and his professionals. So with that, let's unpackage the standard of appeal here. This is abuse of discretion. Abuse of discretion further in the context of the high deference that a court of appeal will pay to the findings of fact and conclusions of law attendant to the award of fees. That is the uphill battle of everything before this panel today. Now, evident by my colleague's opening statements, I think the professional fees are a sideshow really to the big issue of appellant. Appellant doesn't like that the trustee was paid more than he thinks was fair. Fair seems to be belied by statutory context in the calculation of a trustee fee, but I'll put that aside because that's not my argument to make. We've yet to hear one word from anyone today about the professional fees, and I think it's because everything in this appeal, all of the moving papers, all of the issues in front of the bankruptcy judge were dominated by trustee fee issues. As noted in our brief, less than five pages of argument was spent going through how apparently the fees paid to my firm were not appropriate. Now, we put it in our opening brief, almost 1,000 pages of moving papers, detailed billing records. I think the billing records were over 700 pages, detailing ad nauseum every single thing that was done by my firm. In opposition to those fees, what did we get? We got less than one page of high-level arguments from Mr. Shamil by general billing categories. X was spent here, X was spent there. And to me, to look at the standard of appeal, was it an erroneous application of law or was the finding of fact clearly illogical based upon the record? It's a resounding no to both of those questions. But going down each path, nonetheless, I think it's first important to note, and I will sort of echo Mr. Shimano here. He says, I read KVN as follows, and that's the beauty of what we all do for a living. We get to read things differently. We get to argue different sides, but I think the reading of KVN is abundantly clear. The context in which KVN was decided was whether or not it was appropriate to approve a carve-out. KVN states, a prospect of a meaningful distribution, period. That is in approving the carve-out agreement. So to go down the KVN path in and of itself is tantamount to a collateral attack upon a final order of Judge Rizzolo. The carve-out was approved. And again, going from that point forward, the meaningful distribution quote-unquote standard for approval of a professional fee is not how 330 professional fees are ever adjudicated. The issue is, were they actual, reasonable, and necessary? Unequivocally, the answer is yes. And I think without belaboring the point, I do want to clear up a few things because Mr. Shimano's brief is replete with a statement that goes something like this. Everything paid was unreasonable because the trustee knew what the carve-out was out of the gate. True in part... I'll let you finish your sentence, but your time is out. So please go ahead and just wrap up that sentence. True in part because the property sold for over 16 million dollars more than the stocking horse bidder. And we have reduced the general unsecured creditor body by over 160 million dollars. Burning that candle at both ends in order directly to the benefit of the unsecured creditors of which appellants are the majority holders. So with that, I rest and I thank you, Your Honor. Thank you. Okay, Mr. Shimano, you've got a little shy of two minutes. Yeah, there it is. Okay, please go ahead. Quickly, Your Honor. I want to correct, I think, a representation made. The property in the Chapter 11 didn't sell because Mr. Ross wouldn't sell it for under 120 million dollars. When it got... We wanted to convert it to a Chapter 7 because we knew a trustee would sell it for fair market value. The carve-out agreement, which was negotiated very quickly, provided for a mandatory credit bid by the secured creditor. So this was not contingent. They had it baked in into the carve-out agreement. They knew they were getting paid at minimum from a credit bid paid by the secured creditor. The legal issue, according to this court and in the decided decisions is, is there a rational relationship between the fee and the case? And that is a burden that never goes away for the trustee. The trustee has to meet its burden of showing a rational relationship. And the bankruptcy, we think the cases say, yes, in the normal case, you meet that burden by the statutory fee. But in an extraordinary circumstance, you don't meet that burden. You have to come forward with your own evidence of a rational relationship. And they did not do that. They refused to do it and the bankruptcy court let them get away with it. Regarding the professionals, we gave the court many examples of what we think that does not appropriate in this case. The fact that the trustee's own accounting firm got an additional $300,000 in this case, where there is no evidence the trustee did anything in the case should shock this court's conscience and make the court rethink how this works. And finally, we think Judge Klein got it right in Ray Scoggins and every element of extraordinary circumstances present and should be applied in this case and should be reconsidered appropriately. And for that reason, I thank the court. Hopefully, if there's any questions, I'm happy to answer. But I do think this gives you a great case to write a great opinion. On other circumstances, I would say you're welcome, but I don't think I will. But anyway, the matter is submitted. You'll be getting our decision in due course. Thank you. Thank you. Thank you.
judges: Faris, Spraker, and Gan